

**FILED**

SEP 08 2008

RONALD A. GUZMAN
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                            )    No. 07 CR 799
vs.                         )
                            )    Judge Ronald A. Guzman
THOMAS MAN LUNG LO          )

## PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern
District of Illinois, PATRICK J. FITZGERALD, and defendant THOMAS MAN LUNG LO,
and his attorney, DOUGLAS J. RATHE, is made pursuant to Rule 11 of the Federal Rules
of Criminal Procedure and is governed in part by Rule 11(c)(1)(C) and Rule 11(c)(1)(A), as
more fully set forth below.  The parties to this Plea Agreement have agreed upon the
following:

### Charges in This Case

2.    The indictment in this case charges defendant with conspiracy to knowingly
and intentionally distribute and possess with intent to distribute controlled substances,
namely, more than 500 grams of mixtures containing a detectable amount of
methamphetamine, a Schedule II Controlled Substance, and quantities of
3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a
Schedule I Controlled Substance, and more than 100 kilograms of mixtures containing
marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code,
Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18,
United States Code, Section 2 (Count One); and conspiracy to knowingly and intentionally

import into the customs territory of the United States from a place outside the United States, namely, Canada, controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, and more than 100 kilograms of mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 952(a) and 960, all in violation of Title 21, United States Code, Section 963, and Title 18, United States Code, Section 2 (Count Two).

      3.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

      4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

      5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment. Count One charges defendant with conspiring to distribute and possess with intent to distribute more than 500 grams of mixtures containing a detectable amount of MDMA and quantities of methamphetamine, and more than 100 kilograms of mixtures containing marijuana, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

### Factual Basis

      6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant

-2-

conduct pursuant to Guideline §1B1.3:

Beginning in or about November 2003, and continuing until in or about January 2006, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, THOMAS MAN LUNG LO, a/k/a "Tommy Lo" ("LO"), defendant herein, conspired with Ju Wen Zhou ("Zhou"), Kenneth Quoc Luong ("Luong"), Yvonne Law ("Law"), Yong Ouyang ("Alun"), Li Xien Wu ("Wu"), Sejin Oh ("Oh"), Jong Kyun Chae ("Chae"), Carlo Panadero, Carlos Panadero Jr., Jung Bae ("Bae"), Melvin Dumanlang ("Dumanlang"), Jorge Huerta ("Huerta"), Ivan Myint, Jerry Left ("Left") and others to knowingly and intentionally possess with the intent to distribute and distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, and more than 100 kilograms of mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

### Facilitation of Drug Trafficking from Ju Wen Zhou to Sejin Oh

During approximately the Summer of 2003, LO operated a brothel in the Chinatown neighborhood of Chicago. Ouyang and Oh were customers of LO's brothel. In approximately the Summer of 2003, Ouyang informed LO that Ouyang knew a Canadian drug dealer who could sell wholesale amounts of MDMA and hydroponic marijuana. Zhou was the Canadian drug dealer referenced by Ouyang. LO then informed Oh about the ability of Ouyang to procure wholesale amounts of MDMA and hydroponic marijuana. At the time, Oh had partnered with Chae to distribute wholesale amounts of marijuana in the

-3-

Chicago area. Oh stated that he was interested in purchasing MDMA and hydroponic marijuana from Ouyang and Zhou.

Later in Summer 2003, LO organized a meeting at his brothel between Oh, Chae and Ouyang so that they could discuss the possibility of Oh and Chae purchasing wholesale quantities of MDMA and hydroponic marijuana from Zhou. LO organized the meeting due to his anticipation that, by facilitating drug transactions between Zhou and Oh, LO would receive a commission for having brought together the parties to the drug transaction. During the meeting, LO again served as an interpreter between Ouyang, Oh and Chae; in particular, LO communicated in Cantonese with Ouyang and in English with Oh and Chae. Based upon their discussions at the meeting, Oh and Chae agreed to meet with Zhou and his associates in Canada.

In approximately October 2003, LO arranged a meeting between Zhou, Oh and Chae in Chicago at which they discussed the purchase by Oh and Chae of wholesale amounts of MDMA and hydroponic marijuana by Oh and Chae from Zhou. LO again served as an interpreter between Zhou, with whom LO communicated in Cantonese, and Oh and Chae, with whom LO communicated in English. During the discussions, Zhou agreed to sell to Oh and Chae MDMA for $5-$6 per pill and hydroponic marijuana for $2,700 per pound.

In November 2003, LO, Ouyang, Oh and Chae traveled to Toronto, Canada, in order to obtain a sample of MDMA and hydroponic marijuana from Zhou. At a hotel in Toronto, Zhou gave to Oh and Chae approximately 20 MDMA pills and a few grams of marijuana as samples. Oh and Chae then smuggled the samples from Zhou into the United States. Upon their return to the United States, Oh and Chae gave the samples to Huerta because

-4-

Huerta was expected to be their primary drug purchaser. Huerta thereafter communicated to Oh that Huerta was satisfied with the quality of the samples and would purchase wholesale quantities of those drugs from Oh and Chae.

Within a few days of returning from Canada, Oh and Chae ordered approximately 10,000 MDMA pills and 20-30 pounds of marijuana from Zhou. In late November 2003, Zhou traveled to Chicago with the drugs and delivered them to Oh and Chae inside Oh's apartment at 5415 North Sheridan Road in Chicago. LO and Coconspirator A were present for the exchange of the drugs in Oh's apartment. Zhou delivered approximately 12,000 MDMA pills and 25-30 pounds of marijuana to Oh and Chae. The drugs were partially fronted by Zhou to Oh and Chae, meaning that they received a portion of the drugs on credit, with the expectation that payment for the drugs would be made from the proceeds obtained from resale of the drugs. The total drug debt that Oh and Chae owed to Zhou was approximately $70,000.

After obtaining the drugs, Oh and Chae then sold the drugs to various customers at a profit. In particular, Oh and Chae sold approximately 8,000 of the MDMA pills to Huerta and most of the remaining MDMA pills to Ouyang. All of the MDMA pills were sold for $6-$7 each. Most of the marijuana was also sold to Huerta. The marijuana was sold for about $2,900-$3,000 per pound.

However, Oh and Chae managed to repay to Zhou only approximately $40,000 of the $70,000 that they owed to Zhou for the MDMA and hydroponic marijuana. In approximately the middle of December 2003, Oh, Chae, LO and Ouyang traveled to Toronto and met with Zhou to discuss Oh and Chae's existing drug debt. Zhou refused to front any more drugs to Oh and Chae until they had repaid to Zhou the remaining balance

on the debt that Oh and Chae owed to Zhou for the MDMA and hydroponic marijuana.

## Agreement to Sell 10,000 Pills to Undercover Officers

In January 2004, Oh and Chae agreed to sell 10,000 MDMA pills to two new customers who, unbeknownst to them, were two undercover officers ("UCOs") from the DuPage County Sheriff's Office. At the time, Dumanlang, Carlo Panadero and Carlos Panadero Jr. were also participating with Oh and Chae in the drug trafficking operation. LO, also believing that the UCOs were drug traffickers, advised Oh regarding how to deal with the UCOs.

In February 2004, at Oh's direction, Dumanlang traveled to Canada to get a sample of the MDMA pills that Oh and his "crew" intended to sell to the UCOs. Dumanlang then smuggled the sample of MDMA pills back into the United States by secreting the MDMA pills on his person. Oh thereafter gave those MDMA pills to the UCOs as a sample of the pills that Sejin Oh and his crew could sell to the UCOs. Those pills were later determined by laboratory testing to contain both MDMA and methamphetamine. The deal ultimately did not go through due to concerns by Oh about a possible investigation against his crew by the United States Secret Service and Oh's inability to convince Zhou to provide another shipment of MDMA.

## Sale of Drugs from Coconspirator A to Oh and Chae

After the first load of MDMA and hydroponic marijuana was received from Zhou, Coconspirator A contacted Oh and offered to sell MDMA and hydroponic marijuana directly to Oh and Chae. Oh and Chae agreed to buy wholesale amounts of MDMA and hydroponic marijuana from Coconspirator A. Oh made LO aware that Oh and Chae were purchasing MDMA and hydroponic marijuana from Coconspirator A.

-6-

The first loads of drugs sold by Coconspirator A to Oh and Chae consisted of 15-20 pounds of hydroponic marijuana that Coconspirator A delivered to Oh and Chae in Chicago in December 2003 or early 2004. In approximately March 2004, Coconspirator A traveled to Chicago and delivered to Oh and Chae approximately 8,000 MDMA pills and 25-30 pounds of hydroponic marijuana. These drugs were also fronted to Oh and Chae, who thereafter began selling the drugs for profit to various individuals.

Thereafter, as was known to LO based upon his discussions with Oh, Oh continued to purchase substantial wholesale quantities of MDMA from Coconspirator A. In particular, between March 2004 and approximately July 2004, Oh purchased approximately 27,000 MDMA pills from Coconspirator A. Those drugs were delivered by Coconspirator A to Oh in Chicago over a total of approximately six separate deliveries. Oh then resold those MDMA pills to customers in the Chicago area. Huerta was the primary purchaser of Oh's MDMA. On one occasion, Oh received a load of 10,000 MDMA pills and sold them directly to Huerta. Oh's other MDMA customers included co-defendant Ivan Myint, who was a drug trafficker based in the northern suburbs of Chicago.

Also between March 2004 and approximately late June 2004, Oh and LO continued to purchase substantial wholesale quantities of hydroponic marijuana from Coconspirator A and distribute that hydroponic marijuana for profit to various drug customers in an around the Chicago area, including Huerta and Ivan Myint.

In addition, at some point after March 2004, Chae began purchasing hydroponic marijuana directly from Coconspirator A. Chae then resold that hydroponic marijuana for profit to various drug customers throughout the Chicago area. In total, Chae purchased approximately 200 pounds of marijuana directly from Coconspirator A.

-7-

The drugs delivered by Coconspirator A to Oh, Chae and LO were usually fronted by Coconspirator A and delivered to Oh, Chae and LO in the Chicago area by Law or another one of Coconspirator A's couriers. After selling the drugs, Oh, Chae and LO usually paid for the drugs by delivering the drug proceeds to Law or another one of Coconspirator A's couriers at a location in and around the Chicago area.

### June 2004 Meeting Between Canadian Sources and Chicago Drug Traffickers

By June 2004, Oh had again failed to repay to Coconspirator A all of the money that Oh owed to Coconspirator A for MDMA and hydroponic marijuana purchased since March 2004. Therefore, LO arranged a meeting between Zhou, Oh and Ivan Myint so that those co-defendants could discuss the terms and means by which Zhou would continue to traffick MDMA and hydroponic marijuana to Oh and Ivan Myint in Chicago. Ivan Myint was made part of the meeting because Ivan Myint's reputation as a substantial drug trafficker was meant to provide some level of assurance to Zhou that Zhou would be properly repaid for any drugs that Zhou delivered to Oh and Ivan Myint.

The meeting occurred on June 28, 2004, at a Korean restaurant on the north side of Chicago. Also present for the meeting were LO, Luong, Wu, Left and others. LO interpreted between Zhou and Luong, with whom LO communicated in Cantonese, and Oh and Ivan Myint, with whom LO communicated in English. During the meeting, Zhou agreed to sell wholesale amounts of MDMA and hydroponic marijuana to Ivan Myint and Sejin Oh. LO anticipated that, by facilitating these transactions, he might be able to obtain a benefit, such as access to wholesale amounts of MDMA and hydroponic from Oh at reduced prices. At the end of the meeting, Left, at the Ivan Myint's direction, picked up an initial load of 20 pounds of hydroponic marijuana from Wu, who delivered the marijuana to Left

at the direction of Zhou and Luong.

### Drug Trafficking to Oh and LO After June 2004 Meeting

After the meeting on June 28, 2004, Luong delivered several thousand MDMA pills and approximately 100 pounds of marijuana to Oh off of a highway in the Chicago area. LO was present for the delivery. After the drugs were taken by Oh, LO followed Oh to the apartment of co-defendant Bae, at which location Oh stored the drugs. LO followed Oh so that LO could "block" for Oh, meaning that LO could position his car between Oh's car and any law enforcement vehicle that attempted to curb Oh's vehicle containing the drugs. Oh then began to distribute wholesale amounts of those drugs to his various customers, including Ivan Myint.

Between July 2004 and August 2004, a confidential source ("CS1") made one controlled buy of MDMA pills from Huerta and five controlled buys of MDMA pills from Oh. On one occasion, CS1 purchased from Oh approximately 298 MDMA pills that belonged to LO. These pills were subjected to laboratory testing and, for each controlled buy, the pills were determined to consist of mixtures containing MDMA and methamphetamine. The total weight of all of pills purchased by CS1 was approximately 398.43 grams.

### Luong's Distribution of Drugs to Ivan Myint

In addition, based upon the relationship that was established at the meeting on June 28, 2004, Luong also distributed wholesale amounts of marijuana to Ivan Myint. Luong, working through Wu, usually fronted to Ivan Myint approximately 10-20 pounds of hydroponic marijuana approximately every week, provided that Ivan Myint repaid Wu for hydroponic marijuana that Ivan Myint had purchased from Wu on the previous week.

In approximately September 2004, based upon the relationship that was established at the meeting on June 28, 2004, Luong agreed to sell MDMA and hydroponic marijuana directly to Ivan Myint without the participation of Oh, who continued to have trouble meeting his repayment obligations for the drugs he purchased from the Canadian sources. In mid-November 2004, Ivan Myint purchased 30,000 MDMA pills and 100 pounds of marijuana from Luong. At least approximately 1,000 of the MDMA pills purchased from Luong in November 2003 contained methamphetamine. In December 2004, Ivan Myint purchased an additional load of 30,000 MDMA pills from Luong. These drugs were then resold by Ivan Myint to other drug customers for profit. Huerta was a primary purchaser of these drugs.

The amount of drugs that the government can prove to have been involved in LO's offense is approximately 27,250 grams of mixtures containing MDMA, approximately 6,240 grams of mixtures containing methamphetamine and approximately 286 kilograms of mixtures containing marijuana.

7.    Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range for defendant:

In approximately April 2004, Coconspirator A began selling to LO wholesale amounts MDMA and hydroponic marijuana for resale by LO to LO's own drug customers. At first, Coconspirator A delivered the drugs directly to LO on 2-3 occasions. After the first several loads, Coconspirator A began delivering drugs to LO through one of Coconspirator A's couriers. LO also made periodic payments for the drugs to

Coconspirator A's couriers. These drug deliveries and repayments were always made in the Chicago area. Between approximately April 2004 and January 2005, at which time LO ceased purchasing drugs from Coconspirator A, LO had purchased and resold to his customers a total of approximately 14,500 MDMA pills and approximately 300 pounds of hydroponic marijuana. These drugs were delivered to LO by Coconspirator A, in total, over approximately 20 separate deliveries. In general, Ouyang stored the MDMA pills for LO before LO distributed them to LO's customers.

LO eventually made Huerta one of LO's customers. Based upon his discussions with Oh and Huerta, LO knew that Huerta was buying MDMA from Oh for approximately $8 to $9 per pill. Huerta agreed to buy MDMA from LO for $6 per pill. LO eventually sold to Huerta several thousand MDMA pills that LO had purchased from Coconspirator A for $6 per pill.

Approximately one week after the delivery of MDMA and hydroponic marijuana by Zhou and Luong to Oh soon after the June 28, 2004, meeting, LO observed approximately 20 pounds of hydroponic marijuana and approximately 10,000 MDMA pills in Bae's apartment. Later, LO learned from conversations with other individuals that Oh was storing his MDMA pills at locations controlled by co-defendant Andrew So.

8.    The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

### Maximum Statutory Penalties

9.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years' imprisonment.  Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $4,000,000.  Defendant further understands that the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

b.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

### Sentencing Guidelines Calculations

10.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines.  Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**.  The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing.  The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual

-12-

currently in effect, namely the November 2007 Guidelines Manual.

      b.   **Offense Level Calculations**.

      i.   Pursuant to Guideline §§ 2D1.1(a)(3) and (c)(2), the base offense level is 36 because defendant's offense including relevant conduct involved approximately 27,250 grams of mixtures containing MDMA, approximately 6,240 grams of mixtures containing methamphetamine and approximately 286 kilograms of mixtures containing marijuana, which, pursuant to Guideline § 2D1.1(c) (drug equivalency table), is equivalent to approximately 20,150 kilograms of marijuana.

      ii.   Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      iii.   In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

iv.      Based on the evidence now known to the government, the parties agree, subject to the Court's approval, that Guideline § 5C1.2 and Title 18, United States Code, Section 3553(f), are applicable, and that the Court shall impose a sentence without regard to any statutory minimum sentence, and the offense level shall be reduced by two levels, pursuant to Guideline § 2D1.1(b)(11).

c.      **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant has no prior convictions and, therefore, defendant's criminal history category is I.

d.      **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 31, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 108 to 135 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment, if the Court determines that it applies.

e.      Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines

-14-

the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Plea Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.      Both parties expressly acknowledge that this Plea Agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

12.     Defendant agrees he will fully and truthfully cooperate with the United States in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

-15-

### Agreements Relating to Sentencing

13.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Plea Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart from the applicable Guideline range and statutory minimum sentence, if it applies, and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence, if it applies, rests solely with the Court.

14.    If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart from the applicable Guideline range and the statutory minimum sentence, if applicable, as set forth in the preceding paragraph, this Plea Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guidelines range or 66 percent of the statutory minimum sentence, if it applies, whichever is greater. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting this Plea Agreement, or otherwise

-16-

refuses to accept defendant's plea of guilty, either party has the right to withdraw from this Plea Agreement.

15.    If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart from the applicable Guideline range and the statutory minimum sentence, if applicable, as set forth above, this Plea Agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this Plea Agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence, if it applies, without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable.

16.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.    After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining count of the indictment and the forfeiture allegation as to this defendant.

### Presentence Investigation Report/Post-Sentence Supervision

18.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The

government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

19.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer.  Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

20.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced.    Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

-18-

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21.    This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 799.

22.    This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Plea Agreement.

### Waiver of Rights

23.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all

must agree that the trial be conducted by the judge without a jury.

ii.      If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.      If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily,

-20-

he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.    **Waiver of appellate and collateral rights.**    Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation,

-21-

nor does it apply to a request by defendant pursuant to Sentencing Guideline § 1B1.10 and 18 U.S.C. § 3582(c) for a reduction of sentence as a result of an amendment to the Sentencing Guidelines applicable to defendant and expressly made retroactive by the United States Sentencing Commission.

      c.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs.  Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

24.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

25.    Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

26.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement.  Defendant further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Plea Agreement, or may move to resentence defendant or require defendant's specific performance of this Plea Agreement. Defendant understands and agrees that in the event that the Court

permits defendant to withdraw from this Plea Agreement, or defendant breaches any of its terms and the government elects to void the Plea Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

27.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

28.     Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Plea Agreement.

AGREED THIS DATE: _September 8, 2008_

PATRICK J. FITZGERALD
United States Attorney

THOMAS MAN LUNG LO
Defendant

TIMOTHY J. CHAPMAN
Assistant United States Attorney

DOUGLAS J. RATHE
Attorney for Defendant

-23-